Here to give you this honorable report for the 2nd Judicial District is now in session, the Honorable Robert D. McCleary. Please be seated. Call the case please. Wait, don't pull it yet. Overruled by a judge. Your Honor, the first case on the dock this morning is 2-24-0448. In writing a Commitment of Eric Paxton, the people of the State of Illinois petitioner and legal aide, the Eric Paxton, is found impelled. Arguing on behalf of the attorney, Mr. Michael R. Johnson. Arguing on behalf of the attorney, Mr. Russell A. Benson. Mr. Johnson, you may proceed. Thank you. Counsel, why did this case take 10 years to be adjudicated and resolved? Well, there were a variety of issues that were raised by his prior counsel relating to service of process, relating to a previous expert. But ultimately, the only issue that we've raised in our brief is the State's failure to meet its burden of proof beyond a reasonable doubt. And certainly, we all want to see these cases move along in a more reasonable time frame. But no claims are being made as to the delay in this case. Let me ask you this, Mr. Johnson. On November 7th of 2024, our clerk, Mr. Kaplan, sent your client notice that on November 6th, 2024, Counsel for Respondent filed a motion to withdraw. The notice states that a copy of the motion was forwarded to your client at Rushville. The clerk's notice stated, quote, On the court's own motion, this matter has been contained for 30 days from the date hereof in order for you to file a response as to why your counsel's motion should not have been granted and the court should not, after a proper review of the record, affirm the judgment against you. The respondent, your client, did not file a response. On March 10th, four months later, after our notice, we issued a Rule 23 order granting the Anders motion filed by the State's Attorney-Appellate Defender, or the Office of the Appellate Defender, allowing the court and counsel to withdraw, and we affirmed the trial court's order. Tell us why this case is not procedurally defaulted. Well, Justice Burkett, it's not procedurally defaulted. You didn't file your motion until March 27th of 2025. You just talked about timeliness and the importance of timely resolving cases. Why isn't response appeal procedurally forfeited? Well, it's, Justice Burkett, it's not procedurally defaulted or forfeited because a What is a forfeiture? A forfeiture? What is a forfeiture? Would be a party's failure to raise something. Right. Passing on an opportunity, and your client had an opportunity to respond to OSAD's Anders motion. A 63-page, detailed motion, not random. The motion was actually flawed because it did not address any of the issues that we've raised in our briefs. That's not my point. That's not the point. Why isn't it procedurally defaulted? The reason why it's not procedurally defaulted is because this court has already vacated the judgment and allowed briefing to proceed, and so now we're back to addressing the merits of the case. Well, this court can change its mind any time, and we can affirm for any basis supported by the record. My question is, why should it not be procedurally defaulted? Your client sat on his hands and did not respond to the Anders motion. Well, Justice Burkett, I don't believe that that issue is presented by the briefing in this case. Was the Attorney General informed, do you know? Was the Attorney General informed of what? Of Rule 23 affirming a trial court and granting the Anders motion? Yes, I assume so. Yes, because they filed a response asking that the court not vacate the Rule 23 and that the judgment stand, and then two members of this court ruled that it would be vacated and it would proceed to briefing, and that led us to where we are today. So there is no procedural default at play currently. I dissented from that order. Can you tell me where I made a mistake in my dissent? Well, I think that the Anders process can be flawed where there is not an adequate investigation and briefing by the trial counsel. This court said in our word, we reviewed the record. We conducted a thorough review of the record. I know that I did. And at this point, that decision has been vacated, and now we're proceeding with briefing on the merits of the case, where we assert that the state has failed to meet its burden of proof beyond a reasonable doubt. And the client, after he was sentenced to the Department of Corrections, did not participate in sex offender treatment, even though it was offered. Correct? Correct. Justice Burkett, the issue, I think, with answering that question in a straightforward manner, is that a large amount of the testimony in this case was not admitted as substantive evidence. Now, we have the doctors relying on testimony, relying on records that they reviewed, relying on police reports as well as Department of Human Services reports, and certainly those reports that they relied upon stated that he did not participate in treatment, but there was no substantive evidence presented by the state in that regard. Your expert, Dr. Rozelle, acknowledged that the defendant had lied when he told them that he never actually took photos of any of his victims because he had taken 24 photos of young female subjects taken while he was peeping. That's in the record, right, Dr. Rozelle? Is that something the court considered, that your client lied to his own expert? Oh, no. I don't think it's relevant to whether the statement is burden of proof beyond a reasonable doubt because the issue is whether the testimony from Dr. Stanislaus and Dr. Swearer was sufficient to prove both that he had a substantial probability of engaging in acts of sexual violence as well as a mental disorder. So the fact that there was other testimony presented from Dr. Rozelle does not relieve the state of its burden of proof in this case. Your client, according to the question that was asked of Dr. Rozelle, Mr. Paxson has never participated in any sex offender treatment from your review of the records, correct? The answer is yes. That's correct. That's from the review of the records. He never participated in any sex offender treatment. That's correct, and nor was there any evidence presented by the state to prove the effectiveness of sex offender treatment. In fact, Dr. Stanislaus and Dr. Swearer acknowledged that they did not cite any research to support the effectiveness of treatment. They did not cite any research on the effectiveness of treatment at the TDF where Mr. Paxson was being held. And at the end of the day, nobody testified that a lack of treatment was increasing his risk. Instead, what the risk assessment presented by the state consisted of, first their consideration of these actuarial instruments assessing static risk, and then their consideration of dynamic risk. And when we look at the static risk instruments, we see that they scored Mr. Paxson with a 4 on this instrument called the Static 99R, and that is associated with various recidivism rates. So they take the score of 4, and they can look at one of two different samples, or both samples. The one of them is called the Routine Sample, which has several thousand sex offenders who have been followed over a period of time to determine how often each person or each score reoffends. And so the data for that was as low as 8 to 10 percent. And then they also have the High Risk High Needs Group, which was a smaller sample, where Dr. Stanislaus testified that the five-year recidivism rate under that high-risk high-need sample was 17 percent, the 10-year sample was 27, and the 20-year sample was 32 percent. And our position is that each of these recidivism rates was not sufficient on its own to meet the standard of substantial probability, which means much more likely than not. And, in fact, they didn't stop at that. What is enough? Pardon me? What is enough to meet that standard? Well, the risk has to be a substantial probability or much more likely than not. Right. That's the same words trying to define the words. My question is, what is enough evidence? Well, much more likely than not would tend to indicate something that is much more than 50 percent recidivism. And while there's other case law indicating that you can't reduce this to a mere mathematical equation, the issue is that the science has evolved to do just that. Because if we look at this decision from McCormick from the First District, where Dr. Stanislaus testified, and she used this layering method where she couldn't quantify. She had the static risk factors and she was layering the dynamic risk factors. The appellate court, First District, said that was insufficient. But also in that case, Dr. Stanislaus said, the science isn't there to quantify the effect of these dynamic risk factors and add them to the static. But that's changed. And in this case, we've seen how it's changed to the point where the state's own evidence acknowledges that the highest possible risk was just 27 percent. And that is not a proof of substantial probability. There's no other risk to go beyond the 27 percent. And we also recognize, at the same time, that number, 27 percent, it is not just counting sexually violent offenses. It's counting all sexual offenses, even those like peeping or voyeurism, that would not be a sexually violent offense. So that overestimates the risk under our law because it's not a proof of probability. But voyeurism can lead and often has led to criminal behavior. Well, voyeurism itself could be criminal behavior, yes. And I'm talking about sexually violent behavior. It could, yes. Yes. And essentially you're asking us to reweigh the evidence, right? No, we aren't. The issue is whether or not the state met its burden of proof and whether its evidence failed on its own terms, which is exactly what we've argued in our brief. We're not asking the court to reweigh the evidence. Assessing the evidence on its own shows that it did not meet the standard of proof beyond a reasonable doubt. In fact, on the issue of whether voyeurism leads to a sexually violent offense, that's something that the state addressed. And it was through incredibly hedging and vague language by Dr. Swearer about what might happen, what theoretically could happen, what could possibly or likely happen. And he even admitted that his opinion on Mr. Paxton's risk was somewhat speculative. And Dr. Stanislaus' testimony suffered from a similar flaw where she admitted that she had no idea what effect, what deterrent effect Mr. Paxton's prison sentence had on him. Is it your position that Mr. Paxton does not suffer from a mental illness? No, our position is that the state failed to meet its burden of proving that he has a mental disorder, as defined by the Sexually Violent Persons Act, which is not the same as a DSM mental illness. Does there have to be a specific diagnosis? Or can the court look to all the facts collectively? For example, would you agree that Mr. Paxton's fantasies are very disturbing? Having sex with dead children? Why would he have sex with dead children? I would agree that... Looking up how to make chloroform, strangling a child until he or she is dead, and then raping the child because it's okay because the child can't feel it anymore. I would agree that those are disturbing, but the state did not present substantive evidence. Well, they presented evidence that he was masturbating, caught masturbating while he was in the Department of Corrections. And that leads to masturbation fantasies, right? No, Justice Burkett, they did not present that evidence. It's in the record. They presented testimony that their doctors reviewed and relied upon documents from the Department of Human Services that Mr. Paxton was masturbating in his room, but that according to Dr. Swearer, that was not something that he was intentionally targeting anybody. And on top of that, there's no evidence at all about what he was thinking about while masturbating, and they did not prove that he actually did that because in order to do that, they would have had to call a witness who said that they saw him doing that. So your position is everything in those reports is not substantive evidence. It's not an exception to the hearsay rule. It cannot be considered. As truth, yes. It can be considered for the purpose of deciding what weight to give to the expert's testimony. Yes, Your Honor. So you're suggesting to us that the trial court simply got it wrong and listened to all the evidence, considered the basis for the two experts' opinion, which is all these reports, right? But adding it all up, the trial court just got it wrong. Is that your position? It is, Justice Jorgenson, because the standard of review recognizes that you can have a judge or a jury make a finding and then have that finding be overturned on appeal because no reasonable fact finder could have come to that conclusion. That's a pretty high standard. It is, and we think that we've met it in this case because of the multiple areas where the State's opinions are hedging, where they're contradictory. We have Dr. Swear saying that voyeuristic disorder and fetishistic disorder are potentially going to lead him to sexually violent offenses, and therefore they're mental disorders under the law. And then you have Dr. Stanislaus saying, no, they're not. They're not going to lead to that. And then we have the trial court simply making a finding that Mr. Paxton has a mental disorder, doesn't identify what mental disorder it is, doesn't say how it's resolving the conflict in any testimony. So although there's a written decision here, there's nothing really to give deference to in terms of resolving or rationale in resolving the conflicting testimony and the very damaging cross-examination on both of the witnesses, particularly when it comes to the risk element and admitting that this was a speculative opinion. Well, one of the problems that the State's experts encountered was the fact that your client, first of all, he said he doesn't need treatment anymore. He said he doesn't need treatment. Actually, he said he never needed treatment. He refused to speak to Dr. Suri. He refused to speak to the State's experts. Well, no, he did talk to them. Eight years ago. Pardon me? At what point in time? Early on in the case. Yeah. So he basically was on ice for 10 years. Yes, he sat there for 10 years until he went to trial. Got no treatment. That's what the records were relied upon. When I say on ice, if he's, you know, he would be, you're asking for a conditional release, right? No, we're asking, we're not asking for conditional release, actually. That's a different issue. So the result of the trial is whether he's a sexually violent person or not. And if he's not, if the State failed to meet its burden, then that would result in a reversal, as it did in the McCormick and Gavin cases. The separate issue is more akin to a sentencing, which is referred to as the disposition, and that issue is should he be conditionally released or should he remain in a secure facility. So the first step is whether he's an SVP. It's more akin to the guilt or innocence phase. And then the second step is where should he be placed. If he is found to be an SVP, and that's more akin to a sentencing phase, we have not challenged the disposition. We are only challenging whether he's been properly found to be a sexually violent person. Any other questions? I have a question or two. You were citing the probabilities over a period of time or different periods of time. What's his life expectancy, do you know? I don't believe that I recall whether that was in the record. But what I'm getting at is an extrapolation. I was under the impression he's somewhere in his 40s or 50s. Does that seem reasonable to you? I think probably the 40s. And if he's in his 40s or 50s, I don't know what life expectancies are in prison or in a mental institution. But let's assume that he has 25 more years. If he has 25 more years, then what percentile or what percentage of probability is it that he's going to become violent if he's quote-unquote released during his lifetime? Okay. I don't believe that the evidence directly addressed that, but I think that based on what the evidence was, in terms of we know the 5, the 10, the 20 year for the high-risk kinase on the score of 4, and what you can see is that it tends to plateau. So over time, the riskiest period of time is when the person is first released, and then they get less risky as time goes on. And the science supports that in this case in the record. So when you look at, you know, once the person's gone 10 years, so the first 5 years would be 17%, and then the next 5 years were an increase of 10%, and then the next 10 years are an increase of 5%. So there's diminishing returns. And once a person's out in the community living a good life, not reoffending, that the evidence shows that they are less likely to reoffend. Okay. Now, is there any case law or statute defining what the probability is that this person will become sexually violent if they're released? Is there a chart that says that in the first 5 years, if it's 15 or 20 or 20 or 5 or 30 or 35%, then this person is most probably a sexually violent person? Or is there any case law to determine what the probabilities are that would establish beyond a reasonable doubt that this person is sexually violent? So to answer the first question, I don't believe there's a statute that defines that. But the case law is informative because in the case of McCormick, the appellate court held that a risk between those 8% to 10% over 5 years, 22% in 10 years, plus this layering idea that Dr. Stanislaus had to add on top of that, they said that was insufficient to meet the state's burden of proof beyond reasonable doubt. In McCormick, they also relied very heavily on the fact that he was a priest and that he was well over the age of 60 at the time of the hearing. Correct? And considered that as a protective factor, which weighed heavily in the analysis. I don't believe he was over the age of 60 at the time of the hearing. I did rely on the fact that he was a priest, which actually has a... He was, unless I misread it, he was in his 60s. Anyway. Well, the issue with the priest is actually also relates back to this case because of Mr. Paxton having a sex offense conviction is not going to be able to go back to the types of jobs that he had before for the same reason that the priest in McCormick would not be able to go back to that type of job. So that would be reducing his risk. To go back to the McCormick percentages, though, the appellate court held that those percentages on their own, I know they consider other things. That's the point. It was in the context of all these other factors. So what you're asking us to do is go look at that case and cherry pick just the percentages and exclude the context in which it arose. No, because I think in McCormick, the appellate court looked at the percentages first and they said these percentages on their own are not enough. Therefore, we need to continue looking at these dynamic risk factors where Dr. Stanislaus said she was later. So those percentages on their own were not enough. And then in Gavin, we have basically the same conclusion where the percentages were 13% to 19% and that those, again, on their own were not sufficient. And when they went on to look at the dynamic risk factors, they found that they had not been explained by Dr. Swearer. So the state has both of these witnesses who have both independently been found to fail to meet the state's burden of proof, and they came back to court in this case and presented very similar testimony where they failed to explain dynamic risk factors and they offered the same layering testimony that they knew was rejected in a different case. And so... What weight should or should not be given for the fact that this person didn't undergo any voluntary treatment? Well, the record shows that the only thing it could have done is reduce his risk. In other words, the lack of treatment, nobody said that increased his risk. So there's not really a whole lot of weight to give that, especially when it doesn't decrease it because he didn't do it, right? It didn't increase it, and nobody gave any data about whether it's effective or not. Anytime you're having somebody do treatment, they're necessarily having their age increase while they're doing the treatment, and they can't differentiate between reducing effects. They can't or they won't? Well, they did not in this case. They did not in this case. Any other questions? No. Pardon me. Thank you. You'll have an opportunity to make rebuttal.  Yes, rebuttal. Good morning. Good morning, Mr. Benson. My name is Russ Benton, and I represent the people. Before I start, I just want to answer your question four. Mr. Paxton is 38 years old. He was born January 29, 1998. It's in the record on page 44. Now, this is a case, the underlying aspects of this case, is more than child pornography. It's about a man who is obsessed with children, whose escalating behavior he took to satisfy his sexual needs, a man whose whole life revolves around those sexual urges. He took thousands of photos and thousands of photos of new children on his computer. He took hours and hours to insert himself in those photos for his sexual arousal. He applied and took jobs that allowed for physical access to children, and when he had that access, he took actions to satisfy his urges. He then went and made extra effort to... When you say he took actions to satisfy his urges, he didn't sexually assault or molest? Well, under the definition of aggravated criminal sexual abuse, it's if someone who's over 17 has physical sexual conduct with someone under 13. He placed them in his lap, and he told the police he had gotten sexually aroused. So that quantifies as sexual violence, even though he wasn't charged with aggravated sexual abuse. Can I ask you a question? Sure. Why didn't you raise forfeiture? Well, we do not raise forfeiture. We had received the court's order in May allowing briefing, and so after that we just went ahead and briefed in response to his issues, but we did not do that. But, yes, we did receive that order. So he, all of his actions were to satisfy his sexual urges. When he was caught, he told the police he couldn't control those urges. His own omissions were written into evidence at this trial, and because of that, the court found him a sexually violent person. We would ask this court to affirm. Now, I would remind the court that the evidence, the standard is that the evidence is sufficient. When viewed in the light most favorable to the people, a rational fact finder can find beyond a reasonable doubt that he was an SVP, and here the evidence clearly demonstrates that. The first issue that counsel denies that seems pretty clear is that you have to prove a mental disorder. Both of the state's experts opined that the respondent suffered from a pedophilic disorder, which is a qualifying offense. They pointed out his collection of child pornography, his admitted sexual interest in young girls, and taking jobs to be near them. Both opined that pedophilic disorder predisposed him to act and to engage in acts of sexual violence, and that he would suffer this because those were lifelong conditions. When asked if he suffered from pedophilic disorder, Dr. Rozell, the respondent's expert, acknowledged that at one time he met that because he collected child pornography, but when he was asked if he still had that, he figuratively threw up his hands and said, and I'm going to quote, I'm not saying it's not there. I'm just saying it's so difficult to say, oh, it's definitely there. I'm not sure. That's in the record on page 686. Both state's experts diagnosed him with OSPD, non-consent, a qualifying disorder. Both said it was satisfied by his self-reported fantasies and his peeping. Both opined his interest in sex without consent predisposed him to act in matters of sexual violence. Yes. If we're supposed to take him at face value, as I think you've inferred, correct? Yes. Then it means that what he's saying is, in his mind at least, truthful. He is saying it's truthful, but then when he was asked by the experts, he totally denied saying that. But if he is saying it and he believes it's truthful, why doesn't the other experts have the same logic applied to them, which means that they're not as sure as he isn't sure? They are reporting what their scientific training and all of their research have said. And so when he says that, they are taking him for his word. And what are the percentages that they're saying he is probable to, or the probabilities are such, that he will repeat, or I'm not even sure that he's repeated yet, because I'm not sure that he was ever found guilty of a sexually violent act, was he? He was found guilty of a sexually violent act. Child pornography qualifies as a sexually violent act under the statute. So you're saying that if he was found to be not a sexually violent person and he went back into the public domain, so to speak, and he started looking at pornography, he would be considered sexually violent and should be put back in prison? Well, first of all, if nobody, I mean, he's clearly been classed as a sexually violent person. If he went out and did it again, yes, but that's the whole purpose of the act, is to make sure people get treatment and are not released while they suffer from mental disorders and have substantial risk of reoffending. And so when asked about OSPD, Respondents Council basically said, I didn't even consider it, as opposed to ruling it out. So you have two experts who found him pedophilic disorder, two experts who found him OSPD, all three experts found him a voyeuristic disorder, both of the state's experts found him fetishistic disorder, and his counsel said he may meet the criteria for that, but we're not going to look. And so what the argument he's basically asking is he's asking this court to re-weigh the evidence, and which is meritorious. You had two experts who found him to have a mental disorder qualifying under the act, he had his experts who hedged, and he had opportunities, as this court said in Walsh, to thoroughly cross the experts, put his own expert on and argue. And also you said we're re-weighing the evidence. I'm not saying you're re-weighing the evidence, I said he's asking you to re-weigh the evidence. Okay. If I was an actuarial expert and I gave you percentages, would that be an opinion or would that be a fact? That would be their opinion of what the actuarial estimate said. But remember, there are also dynamic factors involved, which all of the experts found, except respondents' experts who acknowledged that he didn't look for them. And so as this court and all of the courts have said, this is the type of evidence that goes to the fact finder. And the fact finder then weighs the evidence, the percentages. There's not a strict percentage. They weigh the evidence, they weigh the percentages, and then make their decision. So you're saying that one fact finder could come up with a finding of not not guilty or whatever if they determined that a percentage of 20% was fatal? If a 30% percentage was fatal or a 15% percentage was fatal? It's one thing to talk about the statistics. It's another thing to talk about what the statistics mean. And you agree that there is no statutory listing or definition of what the probabilities indicate? There's no cases from the Supreme Court to this court to the other appellate courts have said, there is not an actual statistical. You don't have to meet this. It is the fact finder to weigh all of the evidence, to weigh the opinions of the experts. There have been cases, and I apologize, I think it was either Montillo or Montanez, that there was one expert who said it was a substantial problem to re-offend. Three experts did not. And the appellate court said that we will not re-weigh the evidence if that's what the fact finder saw. That's enough to prove it's factual. My concern is if a finder of fact determines in one instance that it's 12% or 15%, and in another instance determines that it's 15% to 22%. And now we've got situations where the fact finder has come up with different parameters. And if that is the case, is there a violation of equal protection of the law? No, because there is not a violation of equal protection, because the fact finder is not simply looking at the actual percent. The fact finder is weighing the evidence, weighing the factors, weighing the lack of protective factors, and then he's coming up with his, what the evidence, his view of the evidence. That's what the fact finder does. The fact finder weighs the evidence. That's part of the evidence. And these cases talk about it's up to them, the fact finder, to weigh the evidence and make a conclusion. In this case, the fact finder weighed the evidence. He saw that the actuarial estimates, as opposed to McCormick and Gavin, were all above average, including that of. So is that the parameter? It's above average, which means it's greater than 50%, or is it greater than what society's percentages are? It is what the entirety of the evidence shows. There is not, there has not been a case law where a court has said it's got to be 18%. It's not simple percentages. It's not simple percentages. It never has been. It's been factors. It's all the factors. The dynamic risk factors, each of the state's experts found multiple dynamic risk factors, including sexual preoccupation, because the gentleman, the respondent, spent all his time thinking about sex with children, working on computers, finding jobs. When asked about dynamic risk factors, respondent's counsel didn't even acknowledge he did not consider the applicability of dynamic risk factors. That's on the record on page 710. They were asked about the lack of protective factors, the window of protective factors. Unlike Gavin and McCormick, he's a young man. He's 38. He was in relatively good health, and he did not participate in any treatment whatsoever. And what's the implication of that? The implication is that there's no, it's not how to protect the factor. This is one of many things that's going in. The fact he did not have treatment in and of itself does not suggest yes or no. In terms of getting better, he's been on ice, right? He's been on ice. That's a very good way of putting it. And so he is arguing, you know, look at these factors. Look at the D factors. Where is the ice and where is the water on the X and Y axis? It is. You don't know if he hasn't done anything that supposedly would allow you to measure it. Well, but that's why there's a substantial risk of reoffending. So there's a presumption here? If you've gone through treatment, that's why he's considered a lot more protective factor. If he'd gone through treatment, if he can show to the doctors, I've started to warn, I've started to work out my problems, that might be different. He's not done anything. What sort of burden of proof is this? Is it the state's to prove that he is violent? Or is it his responsibility to be rehabilitated to go through all the machinations and to establish his goodness? This is a case where the state has to prove he is a sexually violent person. The first part in terms of conviction has already been met. The second part of the mental disorder has been met because you have multiple experts talk about all of the various mental disorders he has. That went to the fact finder. The fact finder credited the state's experts over the petitioner's expert, which he's certainly allowed to do. Then it comes to the risk of reoffending. They talk about the actuarial instruments. They talked about the risk factors. They talked about the lack of effective factors. And so when you measure all of that together, and the fact that he did this doctor result didn't even look for dynamic risk factors, that went to the fact finder effect. And the finder effect said based on this evidence, it is reasonable to find that he is a sexually violent person. And that's what he found. This says all of the stuff about the percentages is akin to what this court said in Tittlebot, where they argued that the court, the trial court, had misinterpreted the rapid risk assessment of sexual recidivism test because it was not credible because they graded it improperly. This court said, look, it's the fact finder who's charged with deciding what reasonable inferences can be drawn from this evidence. And here they did. So where does that leave the respondent? Dr. Russell said he's a hands-off offender. But that's not true. With all the actions he took with the kids in terms of having them on his lap and sliding, he's a hands-on offender. He says all he's shown because he's told me he knows he can't be by children or he can't be by computers. Well, that is clearly not the case because he told the police something opposite. He said he has a greater understanding of the issues because he's been in jail or in treatment for 12 years. But there have been numerous cases where people have been in treatment longer than 12 years and been found not to still be a sexually violent person. He is basically asking this court to trust the respondent has learned. And so for those reasons, if the court has no more questions, I thank you for the time. Any questions? No, thank you. Any questions? No, I do not. I have a question. Sure. Mr. Johnson said something to the effect that this case isn't really over because there are other things that are going to be involved later on. Do you have any comment to his observation? This case is simply about whether he was a sexually violent person. That's what's before this court. That's what the people proved. Anything else about future treatment or future actions is not relevant to what this court has decided, whether this gentleman is a sexually violent person. And, Ken, if he's determined to be sexually violent now, will he be determined for the rest of his life to be a sexually violent person? He's been determined to be a sexually violent person, and he's given the opportunity at various intervals to apply for release, saying that he's had children. He's no longer a sexually violent person. And he can be in society. But we're not there yet. We're simply arguing he was shown to be a sexually violent person from all of the standards and measurements this court and other courts have shown, and this court should affirm the finding of the trial court that he is a sexually violent person. Any other questions? No, sir. Thank you. Thank you, Your Honors. Mr. Johnson?  To take up that last question and add to it, I don't think that, well, first of all, he's already had the disposition hearing where the trial court decided that he should be committed to the Department of Human Services' secure facility, not to conditional release. And that resulted in a final judgment, which allowed this case to be appealed here. And I do agree with the State that the only real issue on appeal is whether he is a sexually violent person. Other proceedings are possible under the SVP Act. Those would be separate proceedings that result in separate final judgments that I don't think that the court should consider. Additionally, I'd like to address the issue of some of the percentages. Before you do that, can you respond to the State's argument that your expert, Dr. Rosell, did not even consider the dynamic risk factors? Yes. I think, well, to begin, a couple times I think he said respondent's counsel, but he really meant respondent's expert, Dr. Rosell. And so Dr. Rosell, this case is not about Dr. Rosell. We're not asking the court to reweigh Dr. Rosell versus the State's witnesses. We're simply asking the court to look at the sufficiency of the State's witnesses. And so for that reason, the testimony from Dr. Rosell is not really before the court when you're considering conflicting testimony between either Dr. Rosell himself or Dr. Rosell with the State's witnesses. You're talking about the amount of weight that is to be given to expert testimony, and you're not arguing to that point. That's correct, Justice McClaren. And now the percentages that we've discussed here and other experts, I think this issue was first, you know, bought off 46 years ago by the United States Supreme Court in the case of Addington versus Texas, and in that case they considered what is the constitutional standard of proof for a civil commitment. And they said that given the lack of certainty and the infallibility of psychiatry, Infallibility or fallibility? Infallibility. I'm sorry. Infallibility means that they're perfect. Fallibility. Okay. Given the lack of certainty and the fallibility of psychiatry, there is a serious question as to whether the State could ever meet its burden of proof beyond a reasonable doubt that a person is both mentally ill and dangerous. And that is precisely what we've seen in the trial court below where the State's experts repeatedly referenced this lack of certainty and failed to meet the State's burden of proof beyond a reasonable doubt. And I'd like to close by pointing out that much of the argument that was made by the State here today is relying on basis of opinion testimony as if it were proven as substantive evidence, and it was not. And we ask the Court not to consider it for that purpose either. Thank you. Hold on. Hold on. You get to ask questions if you want. Sorry. Any questions? No, sir. Joe? Your client's statements are considered and can be considered by the Court. Only the statements that he made to Dr. Swearer and Dr. Stanislaus, yes. Not the statements that he made to people in the TDF or DHS or DHS case reports. No. And what authority is there for that if the trial court cannot consider the defendant's statements? It's the rules of evidence. I'm sorry. It's the rules of evidence. The police did not testify. They did not come to court and say, Mr. Paxton told me this. So, therefore, none of that testimony was admitted as substantive evidence. But they provided a foundation for the opinions of the State's experts, correct? Part of the foundation. The experts did rely on that. That's all. Done? Yep. We'll take the case under advisement. There will be a short recess. Thank you.